806 A.2d 834

IN THE MATTER OF SPECIAL POLICE OFFICERS,
BOROUGH OF KEANSBURG.

Superior Court of New Jersey
Appellate Division

Argued September 12, 2002—Decided September 30, 2002.

Before Judges PRESSLER, CIANCIA and HOENS.

*Thomas P. Scrivo* argued the cause for appellant *Borough of Keansburg* (*McElroy, Deutsch & Mulvaney,* attorneys; *Mr. Scrivo,* of counsel and on the brief; *Michael Rowan,* on the brief).

*David J. DeFillippo,* argued the cause for respondent *Keansburg PBA Local No. 68* (*Klatsky & Klatsky,* attorneys; *Mr. DeFillippo,* of counsel and on the brief).

*June K. Forrest,* Senior Deputy Attorney General, argued the cause for respondent *Merit System Board* (*David Samson,* Attorney General, attorney; *Patrick DeAlmeida,* Deputy Attorney General, of counsel; *Ms. Forrest,* on the brief).

*Jason E. Sokolowski* argued the cause on behalf of amicus curiae *New Jersey State Policemen's Benevolent Association* (*Zazzali, Fagella, Nowak, Kleinbaum & Friedman,* attorneys; *Paul L. Kleinbaum,* of counsel and on the brief; *Mr. Sokolowski,* on the brief).

The opinion of the court was delivered by

PRESSLER, P.J.A.D.

The Borough of Keansburg appeals from a final decision of the Merit System Board prohibiting it from hiring Class Two special police officers for the summer months of 2001 since regular

permanent police officers of the Borough were then in layoff status. It appears that the appeal is moot not only because the 2001 summer season has now passed but also, and more importantly, because it has been represented to us that there are no longer any regular police officers in that status who seek or who are now eligible for reemployment. Keansburg has, in fact, applied for decertification of the layoff list on that basis.[1] We nevertheless address the issue because of its public importance and the likelihood of its recurrence.

The relevant facts are largely undisputed. Faced with a budget crisis, Keansburg, on February 1, 2001, applied to the Division of Human Resource Management in the Department of Personnel (DOP) for permission to lay off permanent employees including a reduction in force (RIF) of eight police officers. The Borough's plan was approved by letter of the DOP dated March 19, 2001, requiring the affected employees to be given forty-five day notices of layoff. The originally scheduled layoff date of May 4, 2001, was extended until May 31, 2002. Respondent Keansburg Local No. 68, the police officers' representative, appealed the RIF, claiming that it was motivated by bad faith rather than by legitimate economic concerns. We were advised at oral argument that that appeal is presently pending in the Office of Administrative Law and will be heard by an administrative law judge in November 2002.

While Local No. 68's appeal was pending and before the layoffs were actually effected, Keansburg announced its intention to hire special police officers for the summer season of 2001, roughly from Memorial Day to Labor Day. Keansburg, a shore community with,

---

[1] Following oral argument, we were advised that the Merit System Board will likely not decertify the list until after conclusion of the so-called good-faith appeal described herein. On the other hand, we were also advised at oral argument that the Borough has restored four of the eight eliminated positions, and that all of the laid-off officers eligible for reemployment have declined a consequent offer of reemployment made by the Borough during the pendency of this appeal.

typically, a large influx of summer residents and visitors, had been hiring ten or so special police officers for the summer months for some years, and the 2001 announcement may be fairly characterized as a continuation of its past practice. This administrative proceeding challenging the Borough's right to hire Class Two special officers ensued. The basis of its challenge lies in its interpretation of the governing legislation.

The hiring of special police officers by a municipality and the conditions, terms, and limitations of such hiring are governed by the Special Law Enforcement Officers' Act (Act), *N.J.S.A.* 40A:14–146.8 to –146.18. We note that in its definitional provisions, the Act takes specific notice of the seasonal needs of shore communities, defining a "resort municipality" as a municipality which, because of its "recreational or entertainment characteristics or facilities" or proximity thereto, "experiences a substantial increase during the seasonal period in the number of persons visiting or temporarily residing there," *N.J.S.A.* 14A:14–146.9f. The Act also enlarges the definition of "seasonal period" for resort communities bordering on the Atlantic Ocean from the four consecutive months applicable to other communities to six consecutive months, *N.J.S.A.* 40A:14–146.9g. "Special law enforcement officer" is defined as a person appointed pursuant to the Act

> to temporarily or intermittently perform duties similar to those performed regularly by members of a police force of a local unit, or to provide assistance to a police force during unusual or emergency circumstances, or at individual times or during regular seasonal periods in resort municipalities.
>
> [*N.J.S.A.* 40A:14–146.9h]

Two classes of special officers are provided for by *N.J.S.A.* 40A:14–146.11a. Class One officers are authorized to "perform routine traffic detail, spectator control and similar duties." They may issues summonses for traffic violations and disorderly persons offenses. They may not, however, carry or use firearms and consequently may not be assigned duties that might require the carrying and use of firearms. Class Two officers are authorized to perform, within the municipality, all of the duties of a regular police officer and may, if so authorized by the municipality, carry

and use firearms after being fully certified as having successfully completed the required training. It is not disputed that Keansburg's prior practice has been the hiring of Class Two special officers for the summer season and that it intended to hire Class Two special officers for the 2001 summer season. Its position is that Class One officers cannot reliably meet its seasonal need.

PBA Local 68's challenge, filed with the Division of Human Services in the Department of Personnel, was based on the proposition that such hiring violated *N.J.S.A.* 40A:14–146.16b, which provides in full that:

> Notwithstanding any provision of this act to the contrary, special law enforcement officers may be employed only to assist the local law enforcement unit but may not be employed to replace or substitute for full-time, regular police officers or in any way diminish the number of full-time officers employed by the local unit.

The challenge was rejected by the Manager of the Division of Human Services, who ruled that the statute would not be violated despite the layoff status of regular police officers, provided the Borough hired no more Class Two special officers for the summer of 2001 than it had for the previous summer. PBA Local 68 appealed that decision to the Merit System Board (Board), which, relying on a 1989 opinion it had issued in a case involving remarkably similar facts, concluded that while the hiring of Class Two special officers during the viability of a layoff list violated the statute, the hiring of Class One officers would not, provided the laid-off officers were given first refusal of the Class One appointments. Keansburg appeals, and we granted the motion of the New Jersey State Policemen's Benevolent Association to appear as *amicus curiae*.

■ The central legal issue before us is simply whether the summer hiring by a shore resort community of seasonal Class Two special officers while there are regular police officers on layoff status automatically violates the prohibition of *N.J.S.A.* 40A:14–146.16b by constituting, based solely on the existence of a layoff list, a replacement or substitution for regular full-time officers or a diminishment of the regular police force. In addressing this question we are mindful of our obligation to accord great weight to

the interpretation of a statute by the agency charged with its administration and implementation. *See, e.g., In re Dist. of Liquid Assets,* 168 *N.J.* 1, 11, 773 *A.*2d 6 (2001); *In re Pub. Serv. Elec. & Gas Co.,* 167 *N.J.* 377, 384, 771 *A.*2d 1163 (2001); *National Waste Recycling, Inc. v. MCIA,* 150 *N.J.* 209, 228, 695 *A.*2d 1381 (1997). Nevertheless, we are not bound by the agency's interpretation if we find it unreasonable or inconsistent with statutory policy. *See, e.g., In re M.F.,* 169 *N.J.* 45, 56, 776 *A.*2d 780 (2001); *Brock v. Public Serv. Elec. & Gas Co.,* 149 *N.J.* 378, 383, 693 *A.*2d 894 (1997). While we are satisfied that the Class Two special officer technique is obviously vulnerable to abuse as a device for replacement or substitution of regular police officers and diminishment of the regular police force and that the preclusion of such abuse is the purpose of the statutory prohibition, we are also convinced that the existence of a layoff list cannot, by itself, be dispositive of the question of whether, in a particular case, hiring Class Two special officers constitutes a violation of the statute. In sum, we are persuaded that the Board construed the statutory prohibition too narrowly and too mechanically. In our view, the statute can be deemed violated only when the hiring of special police officers is intended to and actually results in a substitution of special officers for regular officers or a diminishment of the regular strength of the police force. The determination of whether that is so requires, on a case-by-case basis, a consideration of all the relevant circumstances surrounding the special-officer hiring in light of both the purpose of the prohibition and the policy of the Act.

In a comprehensive opinion addressing the use of special police officers, the Supreme Court has made it clear that municipalities have traditionally been accorded broad discretion by the Legislature to augment their police forces where the need for augmentation is occasional rather than regular, continuous and of unlimited duration. As the Court explained in *Belmar Policemen's Benev. Ass'n v. Belmar,* 89 *N.J.* 255, 270, 445 *A.*2d 1133 (1982):

> More appropriately, special police should be used for emergencies, both anticipated and unexpected. They can be used as well to supplement or augment the regular

force during the summer crunch at the seashore or on a particular weekday night when stores regularly remain open for shopping.

And the policy of permitting municipalities to hire special officers on an occasional basis is patent. Municipalities are thereby enabled to meet the occasional need without incurring the expense of enlarging the regular police force beyond the strength required for regular year-round police protection. Considering the special police problems and consequent needs of shore resort communities recognized both by the Legislature and the courts, we are satisfied that but for the layoffs, there would be no reasonable ground for objection based on the statutory prohibition to the Borough's employment of summer special officers in accordance with its long-standing practice. The issue then is whether the layoffs, *ipso facto*, transform the continuation of this practice into a statutory violation.

We begin our analysis by recognizing the economic problems currently being faced by every level of government. The fact of federal deficits following a long period of budgetary surplus is common knowledge as is this State's budgetary crisis and the concomitant burdens placed on municipalities. As we see the matter then, the first inquiry must be whether or not the reduction in force was made in good faith. As we have noted, the precise issue of the good faith of the Keansburg RIF is still being administratively litigated, but we note that for purposes of its analysis, the Board was apparently willing to assume good faith, concluding, at least inferentially, that even a good faith RIF would result in a statutory violation if Class Two special officers were hired while the layoff list was intact.

We view the matter somewhat differently. There is no question but that the cost of employing special officers is substantially less than that involved in employing regular officers, not only because of the salary differential but also because of the expensive package of fringe benefits, including pension contributions, to which regular officers are entitled. A shore-resort municipality's decision to reduce its regular, standing, year-round police force for economic reasons, a decision which it is authorized by law to make and

which was here approved by the DOP, does not in any way affect its need for enhanced law enforcement services during the summer season. These are essentially entirely separate and independent circumstances. Since the period of service of the special officers is seasonally limited, we think it plain that they cannot realistically be regarded as replacing or substituting for regular year-round full-time officers or as diminishing the regular year-round strength of the department. If that were so, then any Class Two special officer could be asserted to be taking the place of a regular officer, and we do not believe that that was the statutory intent. In short, we see no reason why a municipality cannot at the same time meet its budgetary crisis by a good-faith RIF in the police department and also meet its unavoidable seasonal law enforcement problems by hiring seasonal Class Two special officers. Nor do we believe that the statute interdicts a municipality's right to do so. Indeed, had the RIF taken place in early fall rather than in late spring, the Board might well have viewed the outcome differently.

The significance of the layoffs here then is apparently not so much in the fact that they occurred but rather in their timing. In essence what both the Board and PBA Local 68 are really saying is that statute prohibits the layoff of eight regular officers in May and the hiring of ten Class Two special officers to do their job starting on Memorial Day. But the timing question affects the issue of the Borough's good faith, not only in terms of the RIF itself, but also in terms of whether the RIF, so closely followed by the Class Two special officer hiring, was a pretextual device for replacement, substitution, or diminishment. The facts necessary to determine whether or not that was so are not before us.

There having been no exploration of these or any other relevant factors by the Board, its final decision cannot be affirmed. But because the issue is moot with respect to the summer season of 2001, we need not remand to the Board for its reconsideration. Should a similar situation arise in the future, however, the Board must fully explore the totality of circumstances in reaching its

determination since existence of a layoff list alone is an insufficient basis for concluding that a statutory violation has occurred.

The final decision appealed from is reversed.