980 A.2d 7

IN THE MATTER OF REGISTRANT J.W.

Superior Court of New Jersey
Appellate Division

Argued July 22, 2009—Decided September 28, 2009.

128

Before Judges LANDAU, KING and NEWMAN [1].

---

[1] Judge Newman did not participate in oral argument. However, with the consent of counsel he has joined in the opinion. *R.* 2:13–2(b).

*Jeffrey M. Russo* argued the cause for appellant (*Russo Law Offices,* attorneys).

*Kelly A. Shelton,* Assistant Prosecutor, argued the cause for the State (*Thomas S. Ferguson,* Warren County Prosecutor, attorney).

The opinion of the court was delivered by

LANDAU, J.A.D. (retired and temporarily assigned on recall).

Registrant J.W. appeals from an order of July 8, 2009 entered by a Megan's Law judge affirming his classification as a Tier 2, moderate risk offender. It directed Internet publication of his registration information and notice to several points of child assembly and local schools.

The order includes findings that the State met its burden to establish by clear and convincing evidence a Registrant Risk Assessment Scale (RRAS) score of forty, resulting in moderate risk of recidivism and the consequent directions for scope of notification that included placement into the New Jersey Sex Offenders' Internet Registry.

J.W. had waived indictment and trial by jury in Passaic County, and pled guilty to one count of third-degree attempt to engage in sexual conduct with a child under sixteen, through communications with a person with an explicit sexual nature on the Internet, believing the person to be under the age of sixteen, in violation of *N.J.S.A.* 2C:24–4(a) and *N.J.S.A.* 2C:5–1. He also pled guilty to one count of second-degree attempt to lure or entice a child, by communicating via the Internet with a detective working in an undercover capacity as a twelve-year-old female for the purpose of committing a criminal offense with or against her, in violation of *N.J.S.A.* 2C:13–6.

On January 11, 2007, Registrant was sentenced to concurrent terms of three years on each count. The second-degree luring count was sentenced as a third-degree crime in accordance with the prosecutor's recommendation. Lifetime parole was ordered.

When arrested, Registrant was thirty-years old and had been unemployed for six months. He suffers from Asperger's Syndrome, an autism-related condition that, during his life, appears to have resulted in frequent job changes, some personality problems and a Section Five psychological discharge from the United States Army.

We have heard telephonic oral argument, by Registrant's private counsel and a Warren County Assistant Prosecutor, and have considered those arguments within the context of the evidence in the record placed before the hearing judge. Based upon the entirety of that record, which is unique in several significant respects, we conclude that it clearly and convincingly supports an RRAS score not less than thirty eight, and notification consistent with moderate recidivism risk. Further, our review of the present record convinces us that, based upon undisputed facts peculiar to this case, a moderate risk determination and concomitant notification are here clearly and convincingly called for, even if the RRAS score had been tallied technically at a lesser number. The circumstances in this matter go beyond the "heartland" contemplated in a typical RRAS assessment, and support our supplemental exercise of original jurisdiction to confirm the order under review. *R.* 2:10–5.

The Supreme Court has made clear that even though the RRAS provides a useful guide for the prosecutors and court to evaluate risk of re-offense, the court must still make a value judgment in determining the proper tier classification and scope of community notification based on all of the evidence available to it. These determinations are best made on a case-by-case basis within the discretion of the court. *In re Registrant C. A.,* 146 *N.J.* 71, 108–09, 679 *A.*2d 1153 (1996); *In re Registrant G.B.,* 147 *N.J.* 62, 78–79, 685 *A.*2d 1252 (1996).

Of course, such judgments must be based on evidence that is clear and convincing. *In re Registrant M.F.,* 169 *N.J.* 45, 54, 776 *A.*2d 780 (2001). While the Rules of Evidence do not apply, the court may consider all reliable information. Sexual

offenses, not the subject of a conviction, may be considered in the risk calculus, and may be supported by documentation deemed reliable including, e.g. admissions by the Registrant, police reports and psychiatric reports. *In re Registrant C.A.*, 285 *N.J.Super.* 343, 347–48, 666 *A*.2d 1375 (App.Div.1995), *aff'd, In re Registrant C.A., supra,* 146 *N.J.* at 71, 679 *A*.2d 1153. We will address these factors further in this opinion.

## REGISTRANT'S ARGUMENTS

Registrant offers three principal contentions in support of this appeal: (1) denial of due process; (2) incorrect scoring of RRAS criterion number nine (response to treatment) and criterion number thirteen (employment/educational stability); and (3) failure of the hearing judge adequately to make and explain his findings that clear and convincing evidence support the adoption of the prosecutor's scoring of each of the criteria, and a final RRAS score of forty.

## DUE PROCESS

█ Registrant's due process argument rests upon the refusal of the judge to grant yet another hearing postponement to allow an expert to submit a written report based upon an evaluation said to have been conducted a month earlier. That evaluation was allowed over the prosecutor's objections made only after several earlier hearing postponements had been granted to allow an expert evaluation and report.

The record establishes that after Registrant's release from custody in March 2008, he was notified by the prosecutor's office, on July 17, 2008, of his right to provide information that could be considered for Megan's Law hearing purposes. Responding letters were received shortly thereafter. Registrant's letter indicated that "this was [his] only offense ever[,]" and a letter from family therapist, Dr. Kerr, expressed a "clinical opinion" that Registrant presented a low risk for recidivism.

Registrant was served on November 26, 2008, with the prosecutor's notice of a Tier 2 classification, representing a moderate risk for recidivism.

The Supreme Court's *Outline of Procedures for Megan's Law Cases* and the *Megan's Law Bench Manual* require completion of judicial review proceedings within forty-five days from service of Notice of Classification. Consistent with that mandate, the conference date was set for December 12, 2008. The *Outline of Procedures* requires that the hearing must be held within ten and fourteen days from the date of conference and requires that any non-testimonial submissions must be filed in advance of the hearing date. The hearing date set may, for good cause, be longer than fourteen days for conference, but not longer than forty-five days from that date.

These mandatory time limits, we believe, were established to balance a Registrant's need for adequate preparation time with the clearly expressed legislative concern in adopting Megan's Law that members of the public receive prompt notice respecting released sexual offenders who present a moderate to high risk of recidivism.

Although Registrant had been released from custody on March 24, 2008, the December hearing date originally scheduled was adjourned at the request of Registrant's counsel. The prosecutor represents that the adjournment was requested because counsel proposed to retain Dr. Phillip Witt, the psychologist previously utilized by counsel to evaluate the Registrant prior to the underlying criminal judgment, as an expert. The matter was adjourned until March 2009, in order to permit the expert's evaluation.

No expert evaluation report was received. The prosecutor formally requested the date of evaluation. Receiving no response, a status conference with the court was scheduled for May 29, 2009, at the prosecutor's instance.

Notwithstanding the forty-five day time limitations above-referenced, and over objection of the prosecutor, the court again

adjourned the hearing to July 8, 2009. On July 6, another request for adjournment was received from Registrant's counsel because the expert report of a Dr. Allen would not be available until July 16. The request for further adjournment was denied. Registrant's claim of due process denial is based on the court's refusal to grant further adjournment to allow submission of an expert report, which, counsel represented, would furnish an evidential basis for modification of the tiering and moderate notification levels presented by the prosecutor.

The denial of due process argument is without merit. Both the court and the prosecutor, not only exceeded ordinary courtesy to afford opportunity for submission of an expert evaluation, but did so in violation of the clearly enunciated standards set forth in the Supreme Court's *Outline of Procedures for Megan's Law Cases* and in the *Megan's Law Bench Manual.* More process than due was afforded. We must observe, further, that if the expert report promised by July 16 was not submitted until that date, the prosecutor would, in all likelihood, have requested further time for analysis and possible rebuttal.

### RRAS Scoring

As noted, Registrant asserted that portions of the RRAS were inappropriately scored by the prosecutor. Specifically claimed as error were the prosecutor's assessment of "limited progress" on criterion number nine (Registrant's response to treatment), and the assessment under criterion number thirteen (employment/educational stability).

Registrant was initially notified of an RRAS Score of forty-six. Owing to the multiple adjournments of the originally scheduled December hearing referred to above, more than one year had elapsed since Registrant's March 2008 release. An adjustment was made, with the agreement of the prosecutor, to criterion number seven (length of time since last offense), resulting in reducing the initial RRAS score of forty-six to forty.

The Registrant also raised general objections to the calculation of the critical static factors. We will comment further upon those static factors below in our discussion of the unique fact situation presented in this case.

■ Registrant's argument respecting criterion number nine is that the letter written by the family therapist, Dr. Kerr, with whom he has been continuing therapy, indicated that he has been making good progress. It expresses a clinical opinion that he presents a low risk for recidivism. We note that the assessment is based upon the premise that Registrant did not previously understand the illegality of his conduct, but now understands that it was wrong and has learned his lesson.

Criterion nine was scored by the prosecutor as a moderate risk by reason of limited progress, a view accepted by the Megan's Law judge. We believe the limited progress assessment to be supported by clear and convincing evidence, for several reasons. First, and perhaps most significant, is the assessment made in the report submitted by Registrant's previous expert, Dr. Witt, submitted prior to sentencing for the crimes to which J.W. pled guilty. Dr. Witt is a psychologist who was one of the experts who participated in developing New Jersey's RRAS. The report, made in 2006, prior to Registrant's incarceration, reflects that he was unemployed and lived alone. It also reflects that Registrant received a Chapter 5 honorable discharge from the Army for the following reason:

> The soldier has a chronic congenital pre-existing condition that affects his cognitive and social functioning with no adequate treatment measures that would support his retainability. Clearly, he has no potential for useful service under conditions of full mobilization and should be discharged.

The report sets forth biographical information including multiple job changes before and after the Army discharge. Registrant presented as a "shy man with little insight into his thoughts, feelings, or motives ... he would frequently be unable to articulate any insight into his past behaviors."

Dr. Witt considered Registrant's accelerated activity of frequenting sexually explicit chat rooms on the Internet in which he and adult women would masturbate in each other's view through use of a Web camera over the Internet. Dr. Witt also briefly reviewed some of the actions with juveniles that were considered in the Megan's Law proceeding. He concluded, for reasons set forth in the report that Registrant's "risk appears more elevated than the typical case involving only Internet correspondence without images transmitted or a meeting set up." Further, it was concluded "his social impairment is so significant as to cause him to fall in the moderate rather than the low risk range on the one risk assessment Scale I chose to administer, the SONAR."

Dr. Witt found Registrant's "significant history of social impairment to be consistent with Asperger's disorder," and attributed to that disorder his difficulty in establishing and maintaining ongoing interpersonal relationships, loss of a number of jobs due to social impairment, and self-regulation difficulties. It was recommended that upon Registrant's release to the community, he should be closely supervised by legal authorities, and that attendance and sex-offender-specific treatment should be mandated, particularly in consultation with a psychologist who specializes in Asperger's disorder "to determine if any additional treatment for support services would [aid] him in this regard."

Our affirmance of the "limited progress" evaluation in criterion nine is based on the absence of any reference to psychological attention or treatment for Registrant's Asperger's-related difficulties. Dr. Kerr's letter does report good progress but does not give any indication of the nature of therapy involved, or of her qualifications to perform such psychological Asperger's-related evaluation and treatment. It merely indicates that Registrant now knows that what he did was wrong and is not likely to do it again. While expressed as a "clinical opinion," this would be regarded as a net opinion, were the Rules of Evidence applicable to Megan's Law proceedings.

We do not see how a determination of "good progress" can be accepted absent competent psychological or psychiatric detail as to the nature of treatment, if any, rendered by a qualified expert in Asperger's Syndrome and by prognosis from such an expert.

■ Turning to criterion number thirteen, we note that "unemployed" was surely a correct assessment at the time it was made by the prosecutor and transmitted to Registrant. Indeed, Registrant so described himself when he registered. We do not deem the evidence of his volunteer activity with Habitat nor his relatively recent vocational school and occasional odd job performance to be sufficient to be deemed both "stabile and appropriate." Nonetheless, while accurate when issued, as of the date of the tardy hearing in this matter, we must agree that there was no clear and convincing evidence that this category should be deemed "inappropriate or none." Accordingly, the high risk score of three could be modified to one, resulting in a total of thirty-eight, rather than the forty found by the judge to have been clearly and convincingly demonstrated. This continues to present a Tier 2 moderate range RRAS score.

## ADEQUACY OF FINDINGS

Consistent with *Rule 1:7–4(a)*, the Supreme Court's *Outline of Procedure for Hearings on Objections to Tier 2 or Tier 3 Classification, Scope of Notification Determinations and/or Listing on the Sex Offender Internet Registry*, requires a judge's determination that the prosecutor has carried its burden on those issues by clear and convincing evidence to contain express findings of fact and statement of reasons. Our review of the transcript record discloses that crucial, although abbreviated findings were made in review of the static RRAS factors, but that some of the non-static factors appear to have been accepted (as modified to the score of forty) by an unexpressed assumption of correctness.

As indicated above, we find, at the least, a minimum score of thirty-eight is clearly and convincingly based upon the record before the court. We note, for example, that as to the employ-

ment and schooling criterion, nothing in the record formally reflects Registrant's present enrollment at a vocational school. In any event, he essentially remains as unemployed one year and one-half after release from prison as he was for six months prior to his arrest. We note, too, that Registrant's own letter addressing tiering indicates that he intends to live alone again as soon as he finds employment. Registrant is thirty-three years old. His parents are in their sixties. Thus, while the scoring on criterion number twelve is presently correct in that Registrant resides with his aging parents, this would be of limited duration if he secures employment.

We perceive, however, in this unique case, more compelling reasons to augment the limited findings below. There are facts that, in our view, clearly warrant higher static criteria scoring.

We also conclude that this case fulfills the Supreme Court's recognition that despite the general presumptive reliability of RRAS scores, the court may question a score in unusual cases, "where relevant, material, and reliable facts exist for which the Scale does not account, or does not adequately account," and in cases falling outside the "heartland" of cases. *G.B., supra,* 147 *N.J.* at 82, 85, 685 *A.*2d 1252. The Court further made clear that facts may exist in an unusual case that would warrant a narrowing or expansion of notification ordinarily accompanying a tier characterization. *Id.* at 84, 685 *A.*2d 1252.

### ASSESSMENT OF THE STATIC CRITERIA

■ We address first our views respecting aspects of the several RRAS Static Criteria. Offenses, both by number and degree are understated in their assessment of the degree and potential nature of risk demonstrated by this record. We hold to be clearly and convincingly reliable [2] recorded extracts from fifteen Internet contacts initiated by Registrant with an undercover detective

---

[2] *See C.A., supra,* 146 *N.J.* at 89, 679 *A.*2d 1153.

between October 24, 2005 and March 9, 2006. The detective was performing an online investigation, posing to be a twelve-year old girl. The statement given by Registrant to that detective is equally reliable.

These show clearly and convincingly that Registrant's offenses were of a magnitude greater than those merely sufficient to support the third-degree crimes under *N.J.S.A.* 2C:24-4(a) and *N.J.S.A.* 2C:5-1 to which he was permitted to plead guilty in the first count of his conviction.

■ The details of a sexual offense which is not the subject of a conviction may be considered in the Risk Assessment Scale calculus if the judge relies on documentation deemed relevant and trustworthy. This may include credible admissions by the Registrant, police reports, and psychological reports. *C.A., supra,* 146 *N.J.* at 89, 679 *A.*2d 1153. *See also C.A., supra,* 285 *N.J.Super.* at 348, 666 *A.*2d 1375 (citing with favor the Attorney General's *Sex Offender Risk Assessment Scale Manual* in this regard).

Based upon Registrant's own words, recorded and in his statement, we find: (1) Registrant's attempts included not only a presumed twelve-year old but her similarly presumed nine-year old sister. (2) While himself masturbating on camera in full view, Registrant instructed the presumed twelve-year old not only to masturbate, but to lick the "pee pee" of her nine-year old sister, and further instructed her to ask the nine-year old to lick "your pee pee." He also instructed the twelve-year old to insert a finger into her "pussy."

Were these instructions complied with by real children during these Internet chat room contacts, they would constitute crimes of the first degree. Even if only attempts, they would constitute second-degree crimes. *N.J.S.A.* 2C:14-2 provides, in part, that an actor is guilty of first-degree aggravated sexual assault if he commits an act of sexual penetration with another person, if the victim is less than thirteen-years old. *N.J.S.A.* 2C:14-1(c) defines "Sexual penetration" to include inter alia "cunnilingus ... or

insertion of the hand, *finger* or object into the anus or vagina either by the actor or *upon the actor's instruction.*" (emphasis provided). Under *N.J.S.A.* 2C:5–4(a), a criminal attempt to commit a crime of the first degree is a crime of the second degree.

■ An actor who provides a criminal instruction need not be physically present. Such instruction is within the criminal statute even if made by telephone, and insertion of a finger into the vagina includes an instructed act of self-penetration as well as an instructed act of penetration of another. *State v. Maxwell,* 361 *N.J.Super.* 502, 515–18, 825 *A.*2d 1224 (Law Div.2001), *aff'd o.b.* 361 *N.J.Super.* 401, 825 *A.*2d 1162 (App.Div.); *certif. denied,* 178 *N.J.* 34, 834 *A.*2d 407 (2003).

The *Maxwell* holding is even more telling when considered in the light of the enhanced impact upon a twelve-year old who receives such instructions by Internet from a live actor who is fully visible to her on screen while masturbating.

Were these matters given full weight, including both as to their gravity and the attempt to involve a third victim, the present RRAS score would have warranted further elevation. This is particularly so considering Registrant's further admissions, recorded and in his statement, that he had invited fellatio by the twelve-year old, that he had Internet chats with other minors, and exposed himself and masturbated on screen before at least one eleven-year old female from Buffalo. He also possessed recorded pictures of frontally nude eleven or twelve-year old females, sent to him by an eleven-year old.

## THE "HEARTLAND" ISSUE

■ Dr. Witt, who assisted in the development of the RRAS Scoring System, had been engaged by Registrant's prior counsel in the criminal case to render an evaluation. After examining Registrant in 2006, he prepared a report that is included in the present record. That evaluation presents issues which have fortified our view that this is indeed a case in which the

deference ordinarily afforded to an RRAS score is, as envisioned by the Supreme Court in *G.B.* and *C.A.*, *supra*, one which requires a value judgment on risk that is not within the usual "heartland" of factors considered in the formal RRAS point total. RRAS is not a scientific device, but a "useful tool to help prosecutors and courts determine ... a registrant's risk of re-offense[,]" *C.A.*, *supra*, 146 *N.J.* at 108, 679 *A.*2d 1153, which is ultimately up to the reviewing judge's sound judgment.

Here, the unique issues are several. As Dr. Witt's report observed:

> A risk assessment with Mr. [W.] presents difficulties in that most Sex Offender Risk Assessment Scales have been developed and standardized upon sex offenders with hands on, contact sex offenses with real victims. Such is not the case with Mr. [W.], whose offenses are limited primarily to Internet activity (although he did drive to a meeting with an ostensible twelve year old girl).

The quoted observation points up the emergence of unique kinds of hands off, even anonymous, sexual relationships that can be virtually conducted via Internet "chat rooms." While these may most frequently occur between consenting adults, the present case makes it clear that it is possible for children with newly emerging sexual drives to become victims of predatory virtual contacts. As here, they can include instructions not only for self gratification, but for performance of sexual acts by or between children, titillated by viewing the initiating adult actor's masturbation on screen.

These kinds of contacts do not appear to have been envisioned when developing the RRAS well over a decade ago. They require a prudent exercise of judgment in evaluating the risk of recidivism, on a case-by-case basis. Progress in Internet technology has raised the kind of risk of societal injury far beyond the limited nature of risk originally contemplated to be presented by acts of mere exhibitionism.

As observed by the Megan's Law judge in this case, Internet notification is particularly appropriate for a convicted offender who has employed the Internet as a means to commit serious,

though virtual, sexual crimes or as a personalized first step to recruit a youthful victim for future direct sexual activity.

Dr. Witt's evaluation report raises a second basis for our out-of-the-heartland conclusion. He identified J.W.'s "significant history of social impairment consistent with Asperger's Disorder," and regarded it as "so significant as to cause him to fall in the moderate rather than the low risk range on the SONAR[3]." In addition to recommending close supervision by legal authorities and mandatory attendance in sex-offender specific treatment upon release to the community, Dr. Witt said, "he should receive consultation with a psychologist who specializes in Asperger's Disorder to determine if any additional treatment for support services would [aid][4] him in this regard."

There is nothing in this record from an Asperger's specialist that addresses the psychological underlay of J.W.'s Asperger's condition in the present case, nor the nature and result of any treatment received by Registrant from such specialist, nor a prognosis addressed to the dominant issue of risk before us.

## CONCLUSION

The record demonstrates clearly and convincingly that this unfortunately afflicted Registrant constitutes a moderate risk for recidivism, and clearly and convincingly warrants affirmance of the Internet notification and the relatively limited local notice directed in the order under review.

We are constrained to add our urgent reminder to county prosecutors and to judges charged with the duty to review Megan's Law Notices of Tier Classification and Notification that the

---

[3] A Risk Assessment Scale deemed more appropriate by Dr. Witt in light of the difficulties he mentioned with using other Scales in this kind of case.

[4] A word is evidently missing here, and we have inserted the word "aid," as it is apparent that a word of similar import was intended.

Supreme Court's *Outline of Procedures for Megan's Law Cases* contains meaningful time limits which must be followed.

The order under review is affirmed.